**Electronically Filed
Supreme Court
SCWC-12-0001121
15-MAY-2017
08:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

RAYMOND S. DAVIS,
Petitioner/Defendant-Appellant.

SCWC-12-0001121

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0001121; CASE NO. 1DTA-12-01623)

MAY 15, 2017

McKENNA, POLLACK, AND WILSON, JJ., AND RECKTENWALD, C.J.,
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.

This case concerns the admissibility of two Intoxilyzer Supervisor's Sworn Statements to prove that the Intoxilyzer used to test Raymond S. Davis's breath alcohol content was in proper working order. The State relied on these out-of-court statements in establishing the reliability of Davis's breath alcohol test results, which in turn served as a

basis for his conviction for the offense of operating a vehicle under the influence of an intoxicant.  We consider whether the Intoxilyzer Supervisor's Sworn Statements were admissible given the facts of this case under the Hawaii Rules of Evidence.

## I.    BACKGROUND

The State of Hawai'i filed a complaint in the District Court of the First Circuit (district court), charging that, on March 3, 2012, Raymond S. Davis committed the offense of Operating a Vehicle Under the Influence of an Intoxicant (OVUII), in violation of Hawaii Revised Statutes (HRS) § 291E-61(a)(1) and/or (a)(3) (Supp. 2011).[1]  At the commencement of the bench trial,[2] the State orally arraigned Davis only under HRS § 291E-61(a)(3) for operating or assuming actual physical control

_____

[1]       HRS § 291E-61(a) provides in relevant part:

A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:

(1)  While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty; [or]

.   .   .   .

(3)  With .08 or more grams of alcohol per two hundred ten liters of breath .   .   .   .

HRS § 291E-61(a) (Supp. 2011).

[2]       The Honorable Shirley Kawamura presided.

of a vehicle upon a public way, street, road, or highway with .08 or more grams of alcohol per 210 liters of breath. Davis entered a plea of not guilty to the charge.

The State's first witness was Officer Russell Maeshiro, who testified that on March 3, 2012, around 2:10 a.m., he stopped Davis's car after observing Davis weave in and out of marked lanes without using his blinkers or hand signals. Officer Maeshiro approached the driver's side of the vehicle and observed that Davis had red, bloodshot, glassy eyes and noted that Davis spoke with an apparent slight slur. The officer stated that he asked Davis to complete a field sobriety test after smelling the odor of an alcoholic beverage coming from the interior of Davis's car. At this point in the testimony, Davis stipulated that, based on Officer Maeshiro's observations, the officer had reasonable suspicion to stop Davis and probable cause to arrest him for OVUII.

Officer Kimberly Ann Chaney testified that she transported Davis from the location of the stop to the Kalihi police station. Officer Chaney related that she informed Davis of the implied consent law by reading him form HPD-396K.[3] After

---

[3] Davis has not challenged the validity of his consent to take the breath test. See State v. Won, 137 Hawai'i 330, 372 P.3d 1065 (2015).

Davis elected to take a breath test, Officer Chaney testified that she turned on the Intoxilyzer 8000, identified as serial number 80-003486 (Intoxilyzer), and that the machine proceeded to conduct and pass an internal self-check.

After questioning Officer Chaney regarding the internal self-check, the State asked whether "based on [Officer Chaney's] training and experience in operating the Intoxilyzer 8000," the instrument "appear[ed] to be operating properly and accurately on the date in question." Before Officer Chaney responded, the State showed to defense counsel two Intoxilyzer 8000 Accuracy Test Supervisor's Sworn Statements, dated February 29, 2012, and March 16, 2012 (Sworn Statements 1 and 2, respectively). The State, however, asked no questions of Officer Chaney regarding Sworn Statements 1 and 2. Rather, the State informed the court that Sworn Statements 1 and 2 "show[ed] that the instrument was working properly" and that it sought to admit the documents into evidence as proof of the Intoxilyzer's condition and accuracy.

The top half of Sworn Statements 1 and 2 includes a machine printout of the calibration testing data from the Intoxilyzer. The bottom half of Sworn Statements 1 and 2 includes a pre-printed text block in which a person by the name of Woo Kang is identified as the Intoxilyzer supervisor. As to

4

the machine printout of the calibration testing data, there is a table listing the following information in this order: (1) air blank; (2) simulator temperature; (3) reference sample #1; (4) air blank; (5) air blank; (6) simulator temperature; (7) reference sample #2; (8) air blank; (9) ITP check; and (10) air blank.  Next to each category of information, except the simulator temperatures, is a data entry based on "g/210L BrAC."[4]  Next to each data entry is a time stamp.

The pre-printed text block located in the bottom half of Sworn Statements 1 and 2 contains the following statement:

> I, Woo KANG, swear that the aforementioned information is true and correct and that I am a duly licensed Intoxilyzer 8000 supervisor trained to maintain and perform accuracy tests on the Intoxilyzer 8000.  The Intoxilyzer 8000 is a breath alcohol testing instrument approved for use in the State of Hawaii pursuant to section 321-161 of the Hawaii Revised Statutes as amended.  The Intoxilyzer was operating accurately in compliance with the State of Hawaii Department of Health Administrative Rules, Title Eleven, Chapter 114-7, on the date indicated below, when I conducted the accuracy test recorded on this document.

Below this pre-printed language are the date, Woo Kang's signature, and his license number and its expiration date.

Davis objected to Sworn Statements 1 and 2 being entered into evidence based upon, inter alia: (1) lack of

---

[4]     It appears that "g/210L BrAC" denotes a measurement of alcohol concentration, which Hawai'i Administrative Rules (HAR) § 11-114-4 defines as "grams of alcohol per two hundred ten liters of breath."  See HAR § 11-114-4 (1993).

foundation; (2) hearsay; and (3) hearsay within hearsay. Davis argued that Sworn Statements 1 and 2 did not substantively comply with the requirements of Hawaii Rules of Evidence (HRE) Rule 803(b)(6) (1993 & Supp. 2002), which is the hearsay exception for records of regularly conducted activity (i.e., business records). Further, Davis maintained that without more information or testimony as to Sworn Statements 1 and 2, the data printout reflecting the calibration test results was meaningless to the court; he noted, for example, that there was no evidence presented as to what known reference samples were used in the calibration testing and what their "target values" or output should have been in the machine's data printout. Additionally, Davis contended that there was no information presented as to the specifics of the calibration procedure performed by Kang, which apparently differed from the Intoxilyzer's internal self-check. Davis also objected to the admission of Sworn Statements 1 and 2 into evidence under the public records exception. Davis argued that Sworn Statements 1 and 2 lacked reliability on their face because the State failed to present the circumstances of how the information was obtained, given that Kang did not testify at trial.

The State contended that there was sufficient legal basis under HRE Rule 803(b)(8) (1993 & Supp. 2002) for the

admission of Sworn Statements 1 and 2 into evidence because they were public records made in the course of a regularly conducted activity. The State maintained that each document was a self-authenticating copy of the original log, which was kept in the custody of the Honolulu Police Department (HPD), a public office, and that each document contained a data compilation. The State further argued that the criteria for admitting Sworn Statements 1 and 2 into evidence were met because each document, on its face, complied with the requirements prescribed in the Hawai'i Administrative Rules (HAR), and each document indicated that the Intoxilyzer was "operating accurately" when calibrated. The State maintained that the district court did not need to look at the data printout set forth in Sworn Statements 1 and 2 to determine whether or not the device was operating accurately because Kang swore that the machine was operating accurately in compliance with the HAR.

Over the defense's objection, the district court received into evidence Sworn Statements 1 and 2.[5] The district court, also over objection, admitted into evidence the March 3, 2012 Sworn Statement of Intoxilyzer Operator (Operator

---

[5] The district court did not expressly indicate on what basis it was admitting Sworn Statements 1 and 2 into evidence, but it appears that the court's ruling was based on HRE Rules 902(4) (1993 & Supp. 2002), 1005 (1993), and 803(b)(8) (1993 & Supp. 2002).

Statement), which indicated that the breath alcohol content measured by the Intoxilyzer for Davis was .139 grams of alcohol per 210 liters of breath.

Based on the evidence presented, the district court concluded that the State met the three foundational requirements to show that Davis's breath test results could be relied on as substantive evidence: (1) the Intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered. The court also determined that the State showed strict compliance with the requirements of the HAR. Consequently, the district court concluded that the State proved beyond a reasonable doubt that Davis had .08 or more grams of alcohol per 210 liters of breath at the time he was driving on March 3, 2012. Accordingly, the district court found Davis guilty of the offense charged and entered its Order and Notice of Entry of Order on November 29, 2012.

Davis appealed to the Intermediate Court of Appeals (ICA), challenging the district court's admission of Sworn Statements 1 and 2 into evidence on the grounds that they did not meet the foundational requirements and failed to comply with

the requirements of the business records exception.[6] Davis noted that he had objected at trial to the admission of Sworn Statements 1 and 2 under the Hawaii Rules of Evidence as inadmissible hearsay. Davis further contended that because the district court erred in admitting Sworn Statements 1 and 2, the State failed to present any evidence that the Intoxilyzer used to test his breath alcohol content was in proper working order and thus failed to lay a proper foundation for the admission of his breath test results. In response, the State maintained that the district court properly admitted Sworn Statements 1 and 2 into evidence as public records under HRE Rule 803(b)(8). The State therefore argued that the district court did not err in admitting Davis's breath test results into evidence.

In a Summary Disposition Order, the ICA ruled that the district court did not err by admitting Sworn Statements 1 and 2 into evidence because they were admissible as self-authenticating public records under HRE Rules 803(b)(8) and 902(4). The ICA reasoned that because Intoxilyzer calibration tests by the HPD are required, pursuant to HAR § 11-114-12,[7] to

_____

[6] Davis also contended that Sworn Statements 1 and 2 were inadmissible because both documents were meaningless and irrelevant due to the absence of essential information and because their admission violated his confrontation rights under the Hawai'i Constitution.

[7] HAR § 11-114-12 provides,

(continued. . .)

9

be kept and maintained by the Intoxilyzer supervisor for at least three years, Sworn Statements 1 and 2 are public records or reports of a public agency and, therefore, an exception to hearsay within the meaning of HRE Rule 803(b)(8).[8]  Accordingly, the ICA affirmed the district court's Order and Notice of Entry of Order entered on November 29, 2012.

## II.       STANDARDS OF REVIEW

"When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard."  State v. Jhun, 83 Hawai'i

---

(. . .continued)

        (a)  Records shall be kept and maintained at the direction of a supervisor.

        (b) Records shall include information on:

        . . . .

        (2) Accuracy tests;

        . . . .

        (c)  Records maintained pursuant to subsection (a) shall be retained by the jurisdiction for at least three years.

HAR § 11-114-12 (1993).

[8]      The ICA also concluded that Davis's objection for lack of foundation was without merit and noted that Davis's objection based on relevance was waived pursuant to Hawai'i Rules of Appellate Procedure Rule 28(b)(4).  In the alternative, with regard to the relevancy argument, the ICA indicated that because Sworn Statements 1 and 2 state that "[t]he Intoxilyzer was operating accurately in compliance with the State of Hawai'i Department of Health Administrative Rules, Title Eleven, Chapter 114-7," these documents were relevant to demonstrate that the Intoxilyzer was working properly during Davis's breath test on March 3, 2012.

472, 477, 927 P.2d 1355, 1360 (1996) (quoting Kealoha v. Cty. of Hawai'i, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993)). However, in cases where the rules of evidence require a "judgment call" by the trial court, "the traditional abuse of discretion standard should be applied." Id. Thus, in Jhun, in reviewing the trial court's ruling with respect to hearsay and HRE Rule 803(b)(8), this court applied the right/wrong standard because the trial court did not have to make a "judgment call" when it determined that the proffered evidence failed to qualify under the public records exception, as the report did not set forth factual findings resulting from an investigation. Id. at 477-81, 927 P.2d at 1360-64.

## III.    DISCUSSION

In his Application for Writ of Certiorari, Davis contends that the ICA erred in concluding that the district court properly admitted into evidence Sworn Statements 1 and 2 under the Hawaii Rules of Evidence.[9] Davis maintains that because Sworn Statements 1 and 2 were improperly admitted, evidence of his breath alcohol content obtained from the

---

[9]    Davis also challenges the admissibility of Sworn Statements 1 and 2 based on lack of relevance, lack of trustworthiness, and a violation of his confrontation rights under the Hawai'i Constitution. In light of our disposition of this case, it is not necessary to address these arguments.

11

Intoxilyzer was also improperly received and thus there was insufficient evidence to support his OVUII conviction.

In State v. Thompson, 72 Haw. 262, 814 P.2d 393 (1991), this court noted that to admit a specific Intoxilyzer breath alcohol test result into evidence, the prosecution must lay a proper foundation "to establish the accuracy of the alcohol concentrations used in breath tests." Id. at 263, 814 P.2d at 394. The foundation must show that "(1) the intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered." Id. at 263, 814 P.2d at 394-95 (quoting State v. Souza, 6 Haw. App. 554, 558, 732 P.2d 253, 257 (1987)). This foundation is necessary to prove the reliability of the test result that establishes intoxication before the test result can be relied on as a substantive fact. Souza, 6 Haw. App. at 558, 732 P.2d at 256.

"[I]n meeting the foundational prerequisites for the admission of the Intoxilyzer test result[,] there must be a showing of strict compliance with those provisions of the [Hawai'i Administrative] Rules [governing the testing of blood, breath, and other bodily substances for alcohol concentration] which have a direct bearing on the validity and accuracy of the

12

test result."[10]  State v. Kemper, 80 Hawai'i 102, 105, 905 P.2d

77, 80 (App. 1995) (quoting State v. Matsuda, 9 Haw. App. 291,

293, 836 P.2d 506, 508 (1992)).  This includes establishing that

the calibration procedure used to test the accuracy of the

Intoxilyzer strictly complied with the HAR because the

calibration test has a "direct bearing on the validity and

accuracy of the test result obtained from that Intoxilyzer."

Souza, 6 Haw. App. at 562, 732 P.2d at 259.  Accordingly, in

order "to fulfill the foundational prerequisites of

admissibility" of the test result in this case, the State was

required to show that the Intoxilyzer calibration test, which

has a direct bearing on the validity and accuracy of Davis's

breath test result, was in compliance with HAR § 11-114-7[11] and

_____

[10]    Title 11, chapter 114 of the HAR provides the relevant rules and regulations for the "Testing of Blood, Breath, and Other Bodily Substances for Alcohol Concentration."  It applies to "individuals or laboratories who collect samples for or conduct forensic alcohol testing for the purpose of introduction of the alcohol test results into evidence in . . . criminal proceedings under applicable State driving under the influence of alcohol statutes."  HAR § 11-114-1(b) (1993).

[11]    HAR § 11-114-7 provides the following:

(a)    Every accuracy test procedure shall be approved by the DUI coordinator in writing and shall include, but not be limited to the following requirements:

(1)    The test shall be conducted by a supervisor;

(2)    At least two different reference samples and an air blank shall be run with each accuracy test;

(continued. . .)

was therefore in proper working order on the calibration testing dates.  See id.

### A. Admissibility under Public Records Exception, HRE Rule 803(b)(8)

The State contended at trial, and the ICA agreed, that Sworn Statements 1 and 2 were admissible public records under HRE Rule 803(b)(8) (1993 & Supp. 2002) and thus demonstrated that the Intoxilyzer was in proper working order on the dates of the calibration testing.[12]

---

(. . .continued)

    (3)    Reference samples shall be chosen so that their target values are not less than 0.04gm alcohol/210 liters and not greater than 0.25gm  alcohol/210 liters;

    (4)    Reference sample target values shall differ from each other by at least 0.04gm alcohol/210 liters;

    (5)    Reference sample test results which vary from the target value by more than plus or minus 0.0/gm alcohol/210 liters or plus or minus ten percent, whichever is greater, shall be cause for the breath alcohol testing instrument used to be removed from service until the fault has been corrected; and

    (6)    An accuracy test shall be performed on an operating instrument at intervals not to exceed thirty-one days.

HAR § 11-114-7 (1993).

[12]    At oral argument, counsel for the State maintained that Sworn Statements 1 and 2 would not be admissible hearsay under the public records exception, but that they would instead be admissible under the business records exception.  See Oral Argument at 20:10-26, 23:25-58, State v. Davis, SCWC-12-0001121 (argued Dec. 17, 2015), http://oaoa.hawaii.gov/jud/oa/15/SCOA_121715_scwc12_1121.mp3.  In response to a question by the court,

(continued. . .)

### i. Analysis of "Matters Observed," HRE Rule 803(b)(8)(B)

HRE Rule 803(b)(8) sets forth the public records hearsay exception:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

HRE Rule 803(b)(8) (1993 & Supp. 2002).

Thus, the public records exception to the hearsay rule allows for the admission of records, reports, statements, or data compilations, in any form, of public offices or agencies if those documents contain certain categories of information and meet other requirements of this hearsay exception. Id. Under HRE Rule 803(b)(8)(B), a public record may be admissible if it sets forth "matters observed pursuant to a duty imposed by law as to which there was a duty to report." A record or report will not be admissible under the public records exception, however, if it falls within the exclusion clause of HRE Rule 803(b)(8)(B), which prohibits the admission in criminal cases of

(. . .continued)

counsel changed his position and argued that the public records exception would be a basis for admitting Sworn Statements 1 and 2 into evidence. Id.

"matters observed by police officers and other law enforcement personnel." Id.

Therefore, determining whether proffered hearsay evidence falls within HRE Rule 803(b)(8)(B) requires a two-part inquiry. First, the proponent of the evidence must establish that the record or report presents "matters observed" and that there existed a duty to make and report the observations. Id. Second, the proffered evidence must not fall within the criminal case exclusion clause as a matter observed by law enforcement personnel.[13] Id.; see also Addison M. Bowman, Hawaii Rules of Evidence Manual § 803-3[8][D], at 8-44 (2016-2017 ed.).

As to the first inquiry, the phrase "matters observed" "could reach virtually everything, but apparently it was intended to have [a] narrower meaning." Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 8.50, at 910 (5th ed. 2012). That is, the term "matters observed" narrows the coverage of subsection (B) "to information that is concrete and simple in nature," rather than encompassing all "records describing an almost endless variety of acts, events, and conditions in the

---

[13] Because we conclude below that Kang's statement in the bottom half of Sworn Statements 1 and 2 does not constitute a "matter observed," we need not reach the issue of whether Sworn Statements 1 and 2 fall within the public records exclusion for criminal cases as matters observed by law enforcement personnel. See HRE Rule 803(b)(8)(B).

16

world observed and depicted by public officials." Id. at 910. Indeed, "matters observed" are "routine recordations not resulting from analysis or judgment" and do not encompass "conclusions, opinions, and evaluative findings." Bowman, supra, § 803-3[8][D], at 8-44 (emphasis added); see also Pool v. Wade, 685 N.E.2d 791, 793 (Ohio Ct. App. 1996) (analyzing "matters observed" subsection of similar Ohio public records exception and stating that "[n]otably, the Rule does not include records, or portions of records, that may be characterized as 'evaluations' or 'interpretations' of . . . events or transactions." (quoting Weissenberger's Ohio Evidence § 803.105, at 409 (1996))).

Examples of data or information compilations that do constitute "matters observed" include official weather observations, Village of Evanston v. Gunn, 99 U.S. 660, 666-67 (1878) (meteorological observations by U.S. Signal Service); judgments or orders of the court, State v. Samonte, 83 Hawai'i 507, 538, 928 P.2d 1, 32 (1996) (court record of judgment of conviction); a Coast Guard description of a damaged buoy, United States v. Tug Otto, 296 F. Supp. 1130, 1133 (S.D. Tex. 1967) (record of the board of survey finding that the buoy was damaged beyond economic repair admissible because "[n]o particular degree of expertise would be required to make a determination if

17

a particular buoy were damaged beyond economic repair"); reports detailing observed conditions at institutional facilities, Schwartzberg v. Califano, 453 F. Supp. 1042, 1046 (S.D.N.Y. 1978) (U.S. Department of Health, Education, and Welfare report recounting observations of nursing home and health facility); and "observations in an accident report that describe the scene and equipment and report concrete measurements and easily observable damage or destruction," Mueller & Kirkpatrick, supra, § 8.50, at 911.

### ii. Comparison to "Factual Findings," HRE Rule 803(b)(8)(C)

Comparing the term "matters observed" within subsection (B) of HRE Rule 803(b)(8) and the term "factual findings" within subsection (C) further demonstrates the former's limited scope. "Factual findings from an investigation" admissible under HRE Rule 803(b)(8)(C)'s federal counterpart[14] have been interpreted by the United States Supreme

---

[14] The federal public records hearsay exception is codified at Federal Rules of Evidence (FRE) 803(8) and provides in relevant part:

> **(8) Public Records.** A record or statement of a public office if:
>
> (A) it sets out:
>
> (i) the office's activities;
>
> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case,

(continued. . .)

18

Court to include "conclusions or opinions that flow from a factual investigation."  See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 164 (1988); see also State v. Jhun, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (noting that "independent conclusions or opinions" may be admissible as "factual findings" under HRE Rule 803(b)(8)(C)).  Notably, the legislative history of the federal public records exception suggests that its drafters envisioned the "factual findings" subsection--rather than the "matters observed" or "activities of an office or agency" subsections--as providing the gateway for admission of "evaluative reports" that would otherwise constitute hearsay.  See Beech Aircraft Corp., 488 U.S. at 164-67 (discussing legislative history of FRE 803(8)(A)(iii) and determining that

---

(. . .continued)

> a matter observed by law-enforcement personnel; or
>
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FRE 803(8) (2014).

"Although cases interpreting provisions in the Federal Rules of Evidence are of course not binding on us, we may refer to them for their persuasive authority in interpreting similar provisions of the Hawaii Rules of Evidence."  State v. Jhun, 83 Hawai'i 472, 478, 927 P.2d 1355, 1361 (1996).

the Advisory Committee "surely" intended that "factual findings" subsection would allow for admission of "evaluative reports").

In keeping with this distinction, the term "matters observed" within the federal public records exception has been interpreted as excluding evaluative findings and opinions. See Baker v. Elcona Homes Corp., 588 F.2d 551, 556-57 (6th Cir. 1978). In Baker, a defendant in a vehicular negligence lawsuit sought to introduce a police accident report to settle the disputed fact of whether a traffic light was red or green at the time of an accident. Id. at 555. The police report included (1) the responding officer's visual description of the accident scene upon arrival, including measurements and physical markings, (2) a transcript of the officer's subsequent interview with one of the parties, (3) a notation that "apparently unit #2 (the Valiant) entered the intersection against a red light," and (4) notations that "unit #2" failed to yield the right-of-way and that both drivers were "preoccupied." Id. at 554-55. The police report was admitted into evidence over the plaintiff's hearsay objection. Id. at 555. On appeal, the Sixth Circuit Court of Appeals determined that the "matters observed" and "factual findings" subsections of FRE 803(8) were applicable. Id. at 555-56. The Court of Appeals first concluded that "the direct observations and recorded data" of the responding officer

20

"clearly" constituted "matters observed" within the meaning of FRE 803(8)(A)(ii). Id. at 556. The Sixth Circuit's "principal concerns," however, related to, inter alia, whether the traffic light and fault notations were properly admissible under either the "matters observed" or "factual findings" subsections. Id. The Court of Appeals concluded that the traffic light and fault notations were more appropriately characterized as "factual findings" falling under FRE 803(8)(A)(iii), because they related to "whether the light was red or green for one driver or the other at the time of the accident." Id. at 557. In so deciding, the Sixth Circuit made the following distinction between the "matters observed" and "factual findings" subsections:

> Applying the rule and its background to the facts here, it is apparent that whether the light was red or green for one driver or the other at the time of the accident is distinctly a factual finding within the meaning of the rule . . . . It is also clear from the construction of the rule itself that factual findings admissible under Rule 803(8)[(A)(iii)] may be those which are made by the preparer of the report from disputed evidence, as contrasted to those facts which are "matters observed pursuant to duty imposed by law as to which matters there was a duty to report" called for under Rule 803(8)[(A)(ii)].

Id. at 557-58. Thus, the court considered that the "matters observed" subsection of the public records exception encompassed the "direct observations and recorded data" included by the officer in his accident report, whereas the "factual findings" subsection applied to conclusions or evaluations (i.e., whether

21

the light was red or green at the time of the accident) based on those observations or data.  Id.; see also Bradbury v. Ford Motor Co., 358 N.W.2d 550, 552 (Mich. 1984) (noting the distinction between the "concepts" in the "matters observed" and "factual findings" subsections of the public records hearsay exception).

In this case, to meet the requirements under HRE Rule 803(b)(8)(B), Kang's statement in the bottom half of Sworn Statements 1 and 2 that the "Intoxilyzer was operating accurately" must constitute a "matter[] observed."[15]  See HRE Rule 803(b)(8)(B).  In his sworn statement, Kang indicated that he was a "duly licensed Intoxilyzer 8000 supervisor trained to maintain and perform accuracy tests on the Intoxilyzer 8000." Indeed, HAR § 11-114-7 requires that an Intoxilyzer supervisor conduct the calibration tests, and HAR § 11-114-9[16] prescribes

_____

[15]     The machine printout of the calibration testing data included within the top half of Sworn Statements 1 and 2 may constitute a collection of "routine recordations" qualifying as "matters observed" within the meaning of HRE Rule 803(b)(8)(B).  Bowman, supra, § 803-3[8][D], at 8-44.  Because this court concludes that the sworn statement of Kang included within the bottom half of Sworn Statements 1 and 2 does not constitute a "matter observed," we do not analyze HRE Rule 803(b)(8)(B) with respect to the testing data.

[16]     HAR § 11-114-9 provides in relevant part:

        (b)    No person shall serve as a supervisor without a
        valid license issued by the DUI coordinator or the chief of
        police.

(continued. . .)

the training and licensing requirements for Intoxilyzer

supervisors.  Thus, based on the record and the qualification

requirements for Intoxilyzer supervisors, Kang was required to

have specialized knowledge, experience, and training in

Intoxilyzer calibration testing.  Kang's sworn statement that

the "Intoxilyzer was operating accurately" was based upon his

technical analysis of the data included within the top half of

Sworn Statements 1 and 2, which he collected in conducting the

Intoxilyzer calibration tests.  Therefore, Kang's sworn

---

(. . .continued)

       (c)  A supervisor may practice only in the jurisdiction designated on the license.

       . . . .

       (e)  A supervisor's license shall be effective for three years from date of issuance unless revoked by the issuer.

       . . . .

       (h)  Training programs for supervisors shall:

       (1)  Be conducted either by the DUI coordinator, the chief of police, the chief's representative(s) or, with the written approval of the DUI coordinator or the chief of police, by a representative(s) of the manufacturer of the breath alcohol testing instrument;

       (2)  Consist of a minimum of eight hours; and

       (3)  Be approved in writing by the DUI coordinator except as provided in subsection (j)(1).

HAR § 11-114-9 (1993).

statement that the "Intoxilyzer was operating accurately" is an expert conclusion based on his technical proficiency in Intoxilyzer calibration testing.

Kang's conclusion that the Intoxilyzer was functioning accurately is similar to the responding officer's conclusion in Baker that a driver ran a red light and was at fault for a resulting accident. 588 F.2d at 556-57. The responding officer in Baker gathered data by observing the physical circumstances of the accident scene and conducting other investigative measures; then, based on that data, the officer made a conclusion that the light was red at the time of the accident. Id. at 554-55. Here, Kang gathered data by conducting calibration testing on the Intoxilyzer; then, based on the data he recorded in the top half of Sworn Statements 1 and 2 and using his training and specialized knowledge, he rendered a conclusion that the Intoxilyzer was functioning accurately and included this conclusion in the bottom half of Sworn Statements 1 and 2.

As in Baker, Kang's interpretive conclusion cannot be characterized as a "matter observed" because it is not a "direct observation," a "routine recordation," or "recorded data" reflecting observations that are concrete and simple. 588 F.2d at 556; Bowman, supra, § 803-3[8][D], at 8-44. Kang's

24

conclusion therefore does not constitute a "matter observed."[17] Accordingly, the ICA and the district court erred in admitting Sworn Statements 1 and 2 into evidence as public records under HRE Rule 803(b)(8)(B).[18]

### iii. State v. Ofa Does Not Provide for a Different Result

The dissenting opinion relies primarily on an ICA decision, State v. Ofa, 9 Haw. App. 130, 828 P.2d 813 (1992), in support of its position. Initially, it is noted that the dispositive issue in Ofa was whether the State's failure to include the known temperature of the solutions used to test an Intoxilyzer rendered the resulting calibration tests insufficient to lay a foundation for Ofa's breath test results.

---

[17] The dissent seeks to distinguish Baker by describing Sworn Statements 1 and 2 as "routine determination[s] that a piece of equipment works properly," or alternatively, as "record[s] of the direct observations of the Intoxilyzer supervisor" and thus "plainly . . . 'matter[s] observed.'" Dissent at 6, 8. Even assuming Kang's testing of the Intoxilyzer may be characterized as "routine" in the sense that HAR § 11-114-7(6) requires that such equipment be tested for accuracy by a qualified professional "at intervals not to exceed thirty-one days," Kang's statement as set forth in the bottom half of Sworn Statements 1 and 2 is not a "direct observation[]" or simple "determination that a piece of equipment works properly." Dissent at 6, 8. Rather, for the reasons described above, the statement reflects an evaluative opinion that was based on Kang's specialized knowledge of Intoxilyzer calibration procedures. See HAR § 11-114-7(6) (1993), supra note 11.

[18] Kang's conclusion contained in Sworn Statements 1 and 2 is not admissible under HRE Rule 803(b)(8)(C) as a "factual finding[] resulting from an investigation made pursuant to authority granted by law" because HRE Rule 803(b)(8)(C) is restricted in criminal cases to use only against the government and thus may not be used against Davis in this case. HRE Rule 803(b)(8)(C); see also Jhun, 83 Hawaiʻi at 477, 927 P.2d at 1360 (quoting same).

25

Id. at 139, 828 P.2d at 818. The ICA answered this question in the affirmative and reversed Ofa's conviction on that basis alone. Id. at 141, 828 P.2d at 820. As such, the ICA's other rulings in the case are dicta. Although one of those rulings addressed whether a log book was admissible under HRE Rule 803(b)(8)(B), it is not contrary to our decision in this case.

In Ofa, the defendant was charged with driving under the influence of intoxicating liquor. Id. at 132, 828 P.2d at 815. At trial, the State sought to introduce evidence of the defendant's Intoxilyzer breath test result. Id. at 133, 828 P.2d at 816. As foundational evidence that the relevant Intoxilyzer was functioning accurately on the date that the breath test was administered, the State offered into evidence a copy of a page of a "log book" (Log) maintained by HPD. Id. at 132-33, 828 P.2d at 815-16. HPD criminalist Gilbert Chang, a certified Intoxilyzer operator-supervisor, testified that "certified operator-supervisors periodically test or calibrate the HPD's intoxilyzers for accuracy" and that "the date and results of the testing for accuracy" were entered into the Log. Id. Chang testified that the initials "JW" appearing on the Log signified that John Wadahara "had tested the Intoxilyzer for

accuracy on [the noted] dates."[19]  Id. at 133, 828 P.2d at 816.

Chang further testified that "the Log indicated that the

Intoxilyzer was operating accurately on May 31 and June 28,

1990."  Id.

Over the defendant's objection, the trial court

admitted the Log as a public record under HRE Rule 803(b)(8)(B).

Id. at 135, 828 P.2d at 816.  Ofa raised several issues in

appealing his subsequent conviction, including that the Log

constituted hearsay and that the trial court erred in admitting

it into evidence.  Id. at 134, 828 P.2d at 816.

The ICA concluded that "the only issue" on appeal with

respect to the admissibility of the Log was "whether the Log

[was] excludable from the public records and reports exception

to the hearsay rule as 'matters observed by . . . law

enforcement personnel' in a criminal case."  Id. at 135, 828

P.2d at 817.  Thereafter, the ICA devoted its analysis to the

issue of whether the Log fell within HRE Rule 803(b)(8)(B)'s

exclusion clause.[20]  Id. at 135-137, 828 P.2d at 817.  There was

---

[19]    The Ofa opinion provides no additional information on the
contents of the Log.  9 Haw. App. at 133, 828 P.2d at 815.  The ICA noted
that Wadahara did not testify in the case.  Id. at 133, 828 P.2d at 816.

[20]    In determining whether the Log fell within the exclusion clause,
the ICA discussed the Log's nonadversarial and trustworthy nature.  Ofa, 9
Haw. App. at 136, 828 P.2d at 817.  As in Ofa, issues of the adversarial
nature or trustworthiness of evidence proffered under the "matters observed"

(continued. . .)

no discussion with respect to the first step of the inquiry under HRE Rule 803(b)(8)(B) regarding whether the Log's contents constituted "matters observed." Id. Accordingly, Ofa does not speak to the issue in this appeal--whether evaluative opinions and analyses constitute "matters observed."[21]

In this case, the State sought to lay a foundation for Davis's breath test results through a document that contained both data and evaluative opinion. Although the numerical data included in the top half of Sworn Statements 1 and 2 may be admissible under HRE Rule 803(b)(8)(B), Kang's opinion regarding the Intoxilyzer's accuracy included in the bottom half is not.

---

(. . .continued)

subsection of the public records hearsay exception often arise under this second part of the inquiry rather than the rule's definitional clause. See, e.g., United States v. Wilmer, 799 F.2d 495, 500-01 (9th Cir. 1986) (concluding that "maintenance operator's calibration report" of breathalyzer machine did not fall within exclusion clause because it was a routine act of a nonadversarial nature); United States v. Hernandez-Rojas, 617 F.2d 533, 534-35 (9th Cir. 1980) (concluding that deportation warrant with signed and dated notation "deported to Mexico, Calexico, California" did not fall within exclusion clause because it was a "ministerial, objective observation").

[21]    Thus, neither the holding nor the reasoning of Ofa is "directly applicable to this case," dissent at 5, as Davis does not argue that Sworn Statements 1 and 2 fall within the rule's exclusion clause.

However, although dicta, Ofa does provide an example of the intersection of data, evaluative opinion, and hearsay evidence in OVUII prosecutions in laying a proper foundation for a defendant's breath test results: "[b]ased on the Log and other exhibits in evidence, [the certified Intoxilyzer operator-supervisor] gave his opinion testimony regarding the accuracy of the Intoxilyzer." 9 Haw. App. at 137, 828 P.2d at 817. This combination of evidence, the Ofa court determined, was sufficient to support the admission of the breath test results under the Hawaii Rules of Evidence. Id.

See Bowman, supra, § 803-3[8][D], at 8-44 ("matters observed" falling within HRE Rule 803(b)(8)(B) do not include "conclusions, opinions, and evaluative findings"). Thus, Sworn Statements 1 and 2 are not admissible hearsay under HRE Rule 803(b)(8)(B).

### iv. Use of Sworn Statements in Administrative Driver's License Revocation Proceedings

Our determination that Kang's evaluative conclusions as included within the bottom half of Sworn Statements 1 and 2 do not fall within HRE Rule 803(b)(8)(B) is also consistent with statutory provisions relating to administrative driver's license revocation proceedings following an OVUII arrest. In the administrative revocation process, which is civil in nature, the State is specifically authorized by statute to rely on evaluative conclusions virtually identical to those contained in Sworn Statements 1 and 2 in this case. See HRS § 291E-37(c)(3) (Supp. 2012); HRS § 291E-38(g) (Supp. 2012). Although written statements including conclusions on an Intoxilyzer's accuracy are permitted in a civil process designed to expeditiously revoke the license of the arrestee-driver, reliance on such relaxed evidentiary procedures in criminal proceedings against an individual facing penal sanctions is neither authorized nor called for by time considerations.

29

Under the Hawaii Revised Statutes, administrative driver's license revocation procedures may be initiated following an OVUII arrest when the arresting officer issues a notice of administrative revocation.  HRS § 291E-33(a), (c) (Supp. 2012).  Where the officer has administered a breath, blood, or urine test establishing the driver's alcohol concentration, the relevant authority is required to immediately forward to the director[22] the "sworn statement of the person responsible for maintenance of the testing equipment" to establish, pursuant to HRS § 321-161[23] and rules adopted thereunder, the following information:

> (A) The equipment used to conduct the test was approved for use as an alcohol testing device in this State;
>
> (B) The person had been trained and at the time the test was conducted was certified and capable of maintaining the testing equipment; and
>
> (C) The testing equipment used <u>had been properly maintained and was in good working condition when the test was conducted</u> . . . .

---

[22]    See HRS § 291E-1 (2007) (defining "director" as "the administrative director of the courts or any other person within the judiciary appointed by the director to conduct administrative reviews or hearings or carry out other functions relating to administrative revocation under part III").

[23]    See HRS § 321-161 (2010) (authorizing the department of health to establish and administer a statewide program relating to alcohol concentration testing for purposes of HRS chapter 291E).

HRS § 291E-36(a), (a)(2) (2007 & Supp. 2012) (emphasis added).[24] The director is then required to review the issuance of the notice of revocation, which must include consideration of the sworn statement regarding the working condition of the machine at the time the breath, blood, or urine test was conducted. HRS § 291E-37(a), (c)(3) (Supp. 2012).

If the director administratively revokes the individual's driver's license, the driver may request an administrative hearing to seek review of the decision to revoke the driver's license. HRS § 291E-38(a) (Supp. 2012). At the hearing, the sworn statements relating to the accuracy and condition of the testing equipment must be admitted into evidence, and the director "shall" consider the statements

---

[24] We note that the requirements for accuracy testing of breath testing machines as set forth in HAR § 11-114-7(a) (see supra note 11) apply to all "individuals or laboratories who collect samples for or conduct forensic alcohol testing for the purpose of introduction of the alcohol test results into evidence in either civil or criminal proceedings under applicable State driving under the influence of alcohol statutes." HAR § 11-114-1(b) (emphasis added). This suggests that Sworn Statements 1 and 2, like the sworn statements contemplated by the administrative driver's license revocation statute, are completed pursuant to the accuracy testing procedures of HAR § 11-114-7(a). See Park v. Tanaka, 75 Haw. 271, 278-79, 859 P.2d 917, 920-21 (1993). In fact, at least with respect to the predecessor revocation statute, Sworn Statements 1 and 2 are substantively identical to the sworn statements used in revocation proceedings, in that the top half contains a machine printout from the calibration testing data of the Intoxilyzer, and the bottom half includes a pre-printed text block of the Intoxilyzer supervisor regarding the machine's accuracy. See Ige v. Admin. Dir. of the Court, 93 Hawai'i 133, 139-40, 997 P.2d 59, 65-66 (App. 2000) (detailing contents of sworn statements used in driver's license revocation proceedings under HRS chapter 286 (repealed 2000)).

without requiring the testimony of a law enforcement officer or other person.  See HRS § 291E-38(a) (Supp. 2012); HRS § 291E-38(g).  However, should the individual request to "examine a law enforcement officer or other person who made a sworn statement," the director is required to issue a subpoena for that person to appear at the hearing.  HRS § 291E-38(g).  Thus, the administrative driver's license revocation procedures require admission and consideration of sworn statements regarding a breath test equipment's accuracy and condition, while also mandating that, upon request, the officer or other qualified person be subpoenaed to give testimony at an administrative hearing.

Specifically with respect to the administrative revocation of a driver's license, part III of HRS chapter 291E therefore allows for the submission of documentary evidence to prove that breath test equipment was operating accurately at the time that the test was administered to the individual whose license the State seeks to revoke.  Permitting relaxed evidentiary procedures in this civil setting is in keeping with the purpose of the administrative revocation process itself, which is to "provide for the public safety by establishing a quick, administrative procedure for revoking the licenses of drunk drivers while they are awaiting trial on criminal DUI

charges." State v. Toyomura, 80 Hawai'i 8, 20, 904 P.2d 893, 905 (1995) (quoting Conf. Comm. Rep. No. 137, in 1990 House Journal, at 824, 1990 Senate Journal, at 825) (analyzing predecessor administrative driver's license revocation procedures under HRS § 286-260 (repealed 2000)). In fact, the key benefit of administrative revocation procedures is the ability to bypass those protections afforded to criminal defendants at trial:

> [T]he main benefit of administrative revocation is that it allows the State to remove a drunk driver's license before the culmination of a lengthy prosecution under the criminal statute. Currently, a person charged with driving under the influence must be allowed to continue driving until he or she is found guilty in a court of law. This process takes an average of seven or eight months in Hawaii, and even longer, and while this process is going on, the dangerous driver, who quite likely is an inveterate repeat offender, remains on the road.

State v. Higa, 79 Hawai'i 1, 6, 897 P.2d 928, 933 (1995) (quoting Conf. Comm. Rep. No. 137, in 1990 House Journal, at 824-25, 1990 Senate Journal, at 825). Deeming sufficient a sworn statement regarding maintenance testing on a breath or other test machine, rather than requiring a qualified person to testify at a hearing, is thus one way the administrative revocation process avoids evidentiary and other procedural rules in an effort to prevent "potentially threatening drivers" from continuing to drive "between the time [they] are cited and their criminal adjudication." Id. at 6, 897 P.2d at 933.

33

Significantly, unlike the "legitimate, nonpunitive, and purely remedial functions" of the administrative driver's license revocation process, see Higa, 79 Hawai'i at 7, 897 P.2d at 934, a defendant in an OVUII prosecution faces criminal penalties and loss of the constitutional right to liberty. See HRS § 291E-61(b) (Supp. 2011) (providing imprisonment penalties for the offense of operating a vehicle under the influence of an intoxicant). An individual subject to an OVUII prosecution is guaranteed the protections afforded to criminal defendants by the Hawai'i Constitution, the United States Constitution, and the Hawaii Revised Statutes (which includes the Hawaii Rules of Evidence). Misconstruing HRE Rule 803(b)(8)(B) to allow into evidence in an OVUII criminal prosecution out-of-court evaluative opinions and conclusions similar to those contained within the sworn statements deemed admissible in the civil driver's license revocation process would essentially allow procedures designed specifically for a civil administrative process to be used in a criminal trial.

**v. Davis's Breath Test Results Lacked Sufficient Foundation**

As Professor Bowman explains in his evidence treatise, evaluative opinions that constitute hearsay may not be admitted into evidence under HRE Rule 803(b)(8)(B). Bowman, supra, § 803-3[8][D], at 8-44. Public records that include "information

34

that is concrete and simple in nature" or "routine recordations not resulting from analysis or judgment" may constitute "matters observed" within the meaning of HRE Rule 803(b)(8)(B) and merit admission into evidence under the rule.[25] Mueller & Kirkpatrick, supra, § 8.50, at 910; Bowman, supra, § 803-3[8][D], at 8-44. Public records that do not constitute "matters observed" because they include "conclusions, opinions, and evaluative findings" will not be admissible under the public records exception.[26] Bowman, supra, § 803-3[8][D], at 8-44.

---

[25]  Our opinion does not preclude any "document or record that requires any sort of training or specialized knowledge" from being admitted into evidence under HRE Rule 803(b)(8). Dissent at 9. Rather, a record prepared using training or specialized knowledge may be admissible under the rule provided that its contents constitute "matters observed," in that it does not contain conclusions, opinions, or evaluative findings. Bowman, supra, § 803-3[8][D], at 8-44.

[26]  Though the dissent states that our decision is inconsistent with those of other federal and state courts on "this issue," dissent at 2, 7, it appears that the trial courts of other jurisdictions have routinely utilized a combination of testimony and written data to lay a foundation for evaluative opinions and reports, thereby avoiding the precise issue in this case. See, e.g., Best v. State, 328 A.2d 141, 142-43 (Del. 1974) (Intoxilyzer calibration tests by state chemist introduced in conjunction with testimony of police officer/record-keeper regarding "[the Intoxilyzer's] proper operation and condition at the time of [the defendant's] arrest and testing"); United States v. Gilbert, 774 F.2d 962, 964 (9th Cir. 1985) (card containing impression of fingerprint and "notation that the fingerprint had been 'lifted' from one of the wooden statuettes by Criminologist Sally Jones" introduced in conjunction with testimony of different criminologist that the print on the card was a match to defendant's left thumb); People v. Black, 406 N.E.2d 23, 24-25 (Ill. App. Ct. 1980) (testimony of evidence technician that decal affixed to breathalyzer machine "indicated that it had been recently tested and proven accurate" was sufficient to establish machine's accuracy); State v. Jensen, 351 N.W.2d 29, 31, 32-33 (Minn. Ct. App. 1984) (breathalyzer certification records introduced in conjunction with testimony of operator who administered defendant's breath test regarding "the administration and the reliability of the [breath] test").

(continued. . .)

In order to render evaluative opinions or conclusions based on "matters observed," other evidence may be introduced in conjunction with data properly admitted under HRE Rule 803(b)(8)(B).[27]  This additional evidence may come in a variety

_____

(. . .continued)

Further, the dissent has not identified a case in which this specific issue--i.e., whether evaluative opinions and conclusions constitute "matters observed" within the meaning of HRE Rule 803(b)(8)(B) or its state or federal analogs--has been explicitly considered, reasoned, and ruled on in the affirmative.  See, e.g., State v. Smith, 675 P.2d 510, 511-12 (Or. Ct. App. 1984) (concluding that "two documents certifying that the breathalyzer equipment was in proper operating order" were admissible into evidence under state law public records exception but declining without explanation to address defendant's argument that the two documents "encompass[ed] expert testimony").

[27]   To the extent that the dissent suggests that such a combination of evidence is inconsistent with 24 years of practice in Hawai'i courts, dissent at 2, we note that in numerous cases, the State has laid a foundation for test results in OVUII prosecutions in part by introducing testimony of a qualified Intoxilyzer supervisor or other professional familiar with test equipment calibration procedures.  See, e.g., State v. Werle, 121 Hawai'i 274, 278, 218 P.3d 762, 766 (2009) (testimony from licensed medical technologist that he tested the defendant's blood for alcohol concentration and "outlin[ing] his training and experience in the use and calibration of . . . the device he used to test [the defendant's] blood sample" (internal quotations omitted)); State v. Kemper, 80 Hawai'i 102, 104-05, 905 P.2d 77, 79-80 (App. 1995) (testimony from qualified HPD criminalist that she calibrated the Intoxilyzer and that "the test was performed properly and that the results are accurate" (internal quotations omitted)); State v. Young, 8 Haw. App. 145, 148, 795 P.2d 285, 288 (1990) (testimony from HPD certified Intoxilyzer operator-supervisor that, based on her accuracy checks, the Intoxilyzer was working "properly and accurately" on the date it was administered to the defendant); State v. Ofa, 9 Haw. App. 130, 132-33, 828 P.2d 813, 815-16 (1992) (testimony from HPD criminalist and certified Intoxilyzer operator-supervisor that calibration checks of an Intoxilyzer were periodically performed and that results were reflected in a concurrently-admitted record book); State v. Matsuda, 9 Haw. App. 291, 293, 836 P.2d 506, 507 (1992) (testimony from "HPD evidence specialist" and certified Intoxilyzer supervisor that "he tested the Intoxilyzer . . . for accuracy" prior to and following its use on the defendant); State v. Hamasaki, 7 Haw. App. 542, 542, 783 P.2d 1235, 1236 (1989) (testimony from HPD criminalist and certified Intoxilyzer operator-supervisor that he conducted calibration testing of the Intoxilyzer).

of forms, and our decision in this case will not require the State in every OVUII prosecution to bring to the trial the Intoxilyzer supervisor who conducted the machine's most recent calibration testing.  In this particular case, however, no admissible evidence was adduced in conjunction with the calibration testing data to establish the Intoxilyzer's accuracy, therefore rendering Davis's breath test results inadmissible for lack of the requisite foundation.

## B. Admissibility under Business Records Exception, HRE Rule 803(b)(6)

The State also sought to admit Sworn Statements 1 and 2 as business records under HRE Rule 803(b)(6) (1993 & Supp. 2002).  "Although ordinarily the proponent of hearsay is entitled to 'shop around' among the exceptions, the public records exception of [the Federal Rules of Evidence] preempts this subject matter [of business records] and forecloses access to business records admissibility."  Addison M. Bowman, Hawaii Rules of Evidence Manual § 803-3[6][F], at 8-41 (2016-2017 ed.).  Thus, it is generally understood that records excluded by HRE Rule 803(b)(8) cannot be admitted through the "back door" as a business record under HRE Rule 803(b)(6).  See United States v. Weiland, 420 F.3d 1062, 1074 (9th Cir. 2005) ("The government may not circumvent the specific requirements of [Federal] Rule [of Evidence] 803(8) by seeking to admit public records as

business records under Rule 803(6).  Nor may the government attempt to combine Rules 803(6) and 803(8) into a hybrid rule to excuse its failure to comply with either."); United States v. Orellana-Blanco, 294 F.3d 1143, 1149 (9th Cir. 2002) ("When public records are used against a defendant in a criminal prosecution, the public records exception is the exclusive applicable hearsay exception."); United States v. Cain, 615 F.2d 380, 382 (5th Cir. 1980) ("[S]tatements inadmissible as public agency reports under Rule 803(8) may not be received merely because they satisfy Rule 803(6) . . . section (6) does not open a back door for evidence excluded by section (8).").

As discussed above, Sworn Statements 1 and 2 were not admissible as public records under HRE Rule 803(b)(8).  The State may not "circumvent the requirements" of HRE Rule 803(b)(8)(B) by seeking their admission under HRE Rule 803(b)(6).  Bowman, supra, § 803-3[6][F], at 8-41; Weiland, 420 F.3d at 1074 (indicating that the business records hearsay exception is not an avenue for admitting evidence that is inadmissible under the public records exception).  Therefore, Sworn Statements 1 and 2 were not admissible as business records under HRE Rule 803(b)(6).

## IV.    CONCLUSION

Sworn Statements 1 and 2 were improperly admitted under the public records exception, as they contained an evaluative opinion that does not constitute a "matter observed" within the meaning of HRE Rule 803(b)(8).  Because there was no other evidence presented in this case as to the Intoxilyzer calibration testing, the State failed to lay a sufficient foundation that the Intoxilyzer was in proper working order when the breath test was administered to Davis.  The district court thus erred in admitting the Operator Statement (which contained the result of Davis's breath test) into evidence in light of the improper introduction of the calibration records.  As the breath test result was wrongly admitted, the State failed to show that Davis's breath alcohol concentration was .08 or more grams of alcohol per 210 liters of breath, an essential element of the offense of OVUII under HRS § 291E-61(a)(3).

Accordingly, the ICA erred in affirming the district court's November 29, 2012 Order and Notice of Entry of Order. We therefore vacate the ICA's July 29, 2015 Judgment on Appeal and the district court's November 29, 2012 Order and Notice of Entry of Order and remand the case for a new trial.

| | |
|---|---|
| Phyllis J. Hironaka<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| James M. Anderson<br>for respondent | /s/ Michael D. Wilson |

